IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GENERAL NUTRITION CORPORATION d/b/a NUTRA MANUFACTURING, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 02:11-cv-01566 |
| NATROL, INC., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER OF COURT**

On December 29, 2011, the Court ordered the parties to show cause as to why this matter should not be dismissed for lack of personal jurisdiction (Document No. 5). In response, Defendant Natrol, Inc. ("Natrol") filed a MEMORANDUM IN SUPPORT OF LACK OF JURISDICTION (Document No. 6) and General Nutrition Corporation ("GNC") filed PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S PERSONAL JURISDICTION DEFENSE (Document No. 7). The parties thereafter filed reply memoranda (Document Nos. 10 and 11). Upon review of the applicable law and the filings in this case, the Court finds that it may exercise personal jurisdiction over Natrol.

Factual and Procedural Background

This case arises out a contract dispute between the parties. GNC is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. Compl. ¶ 1. Natrol is a Delaware corporation with its principal place of business in Chatsworth, California. Compl. ¶ 3. On or about February 28, 2011, the parties entered into an agreement whereby Natrol agreed

1

to purchase from GNC its requirement of certain dietary supplements, nutraceuticals, and food products, which it had formerly manufactured itself (the "Supply Agreement"). Compl. ¶ 6. The Supply Agreement was executed in Pittsburgh, Pennsylvania by David Berg, GNC's Chief Operating Officer, and Manmohan Patel, Natrol's Chief Executive Officer. Compl. ¶¶ 7-8.

The gravamen of GNC's Complaint is that Natrol breached the Supply Agreement by (1) continuing to produce the products covered by the Supply Agreement and (2) failed to purchase from GNC any of the products it had agreed to purchase. Compl. ¶ 19. GNC alleges that it advised Natrol of its alleged breach and that Natrol responded by denying that the Supply Agreement had ever been finalized. Compl. ¶ 21-23.

GNC originally filed this lawsuit in the Court of Common Pleas of Allegheny County on November 8, 2011, seeking a declaratory judgment that the Supply Agreement is valid and enforceable and asserting claims for breach of contract and promissory estoppel/detrimental reliance. On December 9, 2011, Natrol filed a timely notice of removal to this Court (Document No. 1). Thereafter, Natrol filed an Answer (Document No. 4), in which it avers that this Court cannot exercise personal jurisdiction over it.

Upon consideration of Natrol's Answer and Affirmative Defenses, the Court ordered each party to brief the issue of the Court's personal jurisdiction over Natrol (Document No. 5). In response, Natrol argues that personal jurisdiction is lacking because (1) it does not have systematic and continuous contacts with Pennsylvania; (2) it did not purposefully contact Pennsylvania, or otherwise create a substantial connection with Pennsylvania, so as to give the Court specific jurisdiction over this matter; and (3) there is no significant state interest in adjudicating the dispute in Pennsylvania and doing so would be unconstitutionally burdensome to Natrol. For its part, GNC contends that the Court can exercise both general and specific

jurisdiction over Natrol and that doing so would not offend traditional notions of fair play and substantial justice.

Legal Analysis

Once a jurisdictional defense is raised, the plaintiff bears the burden of proving, through affidavits or other competent evidence, sufficient contacts with the forum state to establish personal jurisdiction. *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 257 (3d Cir. 1998). Rather than relying on the general averments in the pleadings, the plaintiff must establish those contacts with reasonable particularity. *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992); *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). Furthermore, "[t]he Court must accept the plaintiff's allegations as true and construe disputed facts in his favor." *Stillwagon v. Innsbrook Golf & Marina, LLC*, 2012 WL 501685, at *2 (W.D. Pa. Feb. 12, 2012).

Under Fed. R. Civ. P. 4(e), a federal district court may assert personal jurisdiction over a non-resident defendant in accordance with the law of the state in which it sits. *Eurofins Pharma Holdings v. BioAlliance Pharma S.A.*, 623 F.2d 147, 155 (3d Cir. 2010). Pennsylvania's long-arm statute provides that a court may exercise personal jurisdiction over non-residents "to the fullest extent allowed under the Constitution of the United States." 42 Pa. Cons. Stat. § 5322(b). Therefore, the court must consider "the relationship among the defendant, the forum, and the litigation" in order to determine if personal jurisdiction exists under the precepts of the Due Process Clause of the United States Constitution. *IMO Indus.*, 155 F.3d at 259 (citing *Shaffer v. Heitner*, 433 U.S. 186 (1977)).

Due process requires that the defendant have "minimum contacts" in the forum state. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Supreme Court has explained that "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Asahi Metal Indus. Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 109 (1987) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Personal jurisdiction may be exercised under two distinct theories. *See Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001). General jurisdiction is based upon the defendant's "continuous and systematic" contacts with the forum and exists even if the plaintiff's claim arises from the defendant's non-forum related activities. *Id.*; *see also Vetrotex Certainteed Corp. v. Consol. Fiberglass Products Co.*, 75 F.3d 147, 151 n.3 (3d Cir. 1996). Specific jurisdiction, however, exists only "when the claim arises from or relates to conduct purposely directed at the forum state." *See Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008). In examining whether specific jurisdiction exists:

> a court generally applies two standards, the first mandatory and the second discretionary . . .
>
> First, a court must determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have reasonably anticipate[d] being haled into court there . . . .
>
> Second, assuming minimum contacts have been established, a court may inquire whether the assertion of personal jurisdiction would comport with fair play and substantial justice. Although the latter standard need only be applied at [the] court's discretion, . . . [the Court of Appeals for the Third Circuit] generally [has] chosen to engage in this second . . . analysis . . . .

*Pennzoil Products Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 201 (3d Cir. 1998) (citations omitted).

4

As a threshold matter, Natrol contends that the Supply Agreement in actuality was with an entity known as Nutra Manufacturing ("Nutra"), which is allegedly a GNC subsidiary corporation based in South Carolina. Natrol further contends that any proposed agreement between Natrol and Nutra was to be effectuated in South Carolina, where Nutra's manufacturing plant is located, and not in Pennsylvania. According to Natrol, Nutra is improperly implicating GNC to establish a jurisdictional basis for bringing suit in this Court. In support of this argument, Natrol has attached several public documents purporting to show that it was dealing only with Nutra and not GNC, including an SEC 10-K filing outlining GNC's corporate structure; a printout of a page from Nutra's web site; and a record from the South Carolina Secretary of State reflecting that Nutra was once a separate corporate entity but merged into GNC in 2008.

Natrol's argument is unavailing for several reasons. First, the Supply Agreement itself was executed by GNC's chief operating officer and makes clear that Nutra Manufacturing is merely a "doing business as" name for GNC. *See Trustees of Constr. Indus. and Laborers Health and Welfare Trust v. C & W*, 298 Fed. Appx. 566, 567 (9th Cir. 2008) ("The designation 'd/b/a' is merely descriptive of a corporation that does business under some other name and does not create a distinct corporate entity."). In addition, GNC has provided ample evidence to establish that Natrol understood that it was dealing with GNC. For example, Natrol executives made visits to GNC's offices in Pittsburgh to discuss the proposed business arrangement and exchanged other communications with GNC attorneys and other personnel in Pittsburgh over an extended period of time. These communications, which include emails from Natrol's CEO, Manmohan Patel, plainly indicate that Natrol believed it was entering an agreement with GNC. *See, e.g.,* Plaintiff's Ex. 4 (email from Patel to Berg stating that "[Natrol's parent company]

5

Plethico is very interested in the joint venture between they and GNC"); Plaintiff's Ex. 19 (email from Patel to Berg stating "[Plethico] is very interested in doing business with GNC"). Therefore, based on the evidence presented, the Court finds that Natrol knew that it was dealing with Pittsburgh-based GNC, and it is Natrol's dealings with GNC that control the jurisdictional inquiry.

Turning to the nature of Natrol's contacts with the forum state, it is well-settled that the act of entering into a contract with a resident of the forum is alone insufficient to justify the exercise of specific jurisdiction over a non-resident defendant. *Farino*, 960 F.2d at 1223. Nevertheless, "courts should inquire whether the defendant's contacts with the forum were instrumental in either the *formation of the contract* or its breach." *General Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (emphasis added). As the Supreme Court has emphasized, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp.*, 471 U.S. at 462. In such case, it is not unreasonable to require a contracting party who "'deliberately' [] engaged in significant activity within a State . . . or has created 'continuing obligations' between himself and residents of the forum," to submit to suit in that forum as well. *Id.* at 475-76 (citations omitted).

A non-resident defendant's physical presence in the forum during pre-contractual negotiations, performance, and resolution of post-contract difficulties should be factored into the jurisdictional determination. *General Elec. Co.*, 270 F.3d at 150. However, physical presence within the forum "is no longer determinative in light of modern commercial business arrangements; rather, mail and wire [contacts] can constitute purposeful contacts when sent into the forum." *Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 177 (3d Cir. 2006) (citation

6

omitted); *Farino*, 960 F.2d at 1223 (explaining that a court may find that sufficient contacts exist when looking at the totality of the parties' relationship, including their entire course of dealings with each other); *Grand Entm't Group Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) (holding that "contract negotiations with forum residents can empower a court to exercise personal jurisdiction over persons outside the forum").

In this case, contrary to Natrol's attempts to characterize the extent of the communications between the parties as a "few isolated emails," there is sufficient evidence to support the conclusion that Natrol purposefully directed its activities at this forum, as is required for the exercise of specific jurisdiction. In particular, on August 30, 2010, Patel and Patrick McCullough, President of Natrol, met with David Berg in Pittsburgh to discuss the conceptual framework of what would eventually become the Supply Agreement. Pl. Ex. 4. The August 30 discussions in Pittsburgh led to the creation of a concept sheet "covering the general principals of the deal," which was circulated among executives of both parties, including Patel, McCullough, and Berg. Pl. Ex. 5. In October 2010, the parties began negotiating the final terms of the agreement via email. Plaintiff's Ex. 9. Over the next three months, Kevin Dwyer, Natrol's in-house counsel, and David Sullivan, one of GNC's in-house attorneys based in Pittsburgh, exchanged numerous emails and phone calls discussing proposed changes to the contract language. *See generally* Pl. Ex. 9-15.

Natrol executives also continued to communicate directly with GNC executives in Pittsburgh regarding the proposed agreement. For example, on January 26, 2011, Patel had a telephone call with Berg, in which he attempted to resolve several open issues related to the Supply Agreement. Pl. Ex. 16. One month later, Patel had a conference call with GNC CEO Joe Fortunato to discuss the progress on the deal. Pl. Ex. 17. Later that month, Patel exchanged

7

emails with both Berg and Fortunato in a final attempt to iron out the terms of the agreement. Pl. Ex. 18.

After the Supply Agreement was executed, attorneys for GNC and Natrol continued to exchange emails regarding the finalization of certain exhibits to be attached to the agreement. Pl. Ex. 20. These finalized exhibits were transmitted in an attachment to an email sent by Dwyer to Sullivan on June 13, 2011. Pl. Ex. 21. As our appellate court made clear in *Telcordia Tech*, telephone and email contacts made in connection with the formation of a contract – in addition to the actual visit paid to Pittsburgh by Patel and McCullough – "constitute purposeful availment" for purposes of the jurisdictional analysis. 458 F.3d at 177; *see also Quantum Plating, Inc. v. Central Freight Lines, Inc.*, 2011 WL 673913 (W.D. Pa. Feb. 17, 2011) (holding that "numerous contacts by [defendant] with this forum by telephone, email and fax in conjunction with the finalization of the contract" constituted purposeful availment).

Defendant suggests that the fact that "Plaintiff Nutra initiated the first contact" belies a finding of purposeful availment. However, as the United States Court of Appeals for the Third Circuit has explained:

> It is not significant that one or the other party initiated the relationship. *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992). In the commercial milieu, the intention to establish a common venture extending over a substantial period of time is a more important consideration.

*General Elec. Co.*, 270 F.3d at 151. Based on the communications between high-level executives from GNC and Natrol, GNC has demonstrated that Natrol intended to engage in such a common venture, at least for the duration of the Supply Agreement.

Moreover, the requirement that the litigation "arises out of" at least one of Natrol's contacts is easily satisfied in this case, as this lawsuit focuses on the Supply Agreement which arose from Natrol's dealings with GNC in Pennsylvania. Because Natrol had sufficient

minimum contacts with the forum, and GNC's claim arises out of those contacts with the forum, specific personal jurisdiction exists. It is therefore unnecessary to address GNC's argument as to the existence of general jurisdiction over Natrol.

The Court also finds that the exercise of personal jurisdiction over Natrol would not offend traditional notions of fair play and substantial justice. At this stage of the jurisdictional analysis, Natrol bears a heavy burden because the existence of minimum contacts makes jurisdiction presumptively valid. *O'Connor*, 496 F.3d at 324. To that end, Natrol must come forward with a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Grand Entm't*, 988 F.2d at 483. In deciding whether a defendant has met its burden, the Court must weigh "the burden on the defendant [in litigating in an out-of-state forum], the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the several states in furthering substantive social policies." *Burger King Corp.*, 471 U.S. at 477.

Here, Natrol has failed to present a compelling case that it would be unreasonable to subject it to jurisdiction in this forum. While Natrol contends that the difficulty and expense of forcing it to litigate in Pennsylvania would be unfair because it does not maintain offices, have agents or employees, or own or lease property in Pennsylvania, inconvenience alone is insufficient to demonstrate that litigating in Pennsylvania would impose an unconstitutional hardship. *See Burger King Corp.*, 471 U.S. at 483 (stating that "[i]nconvenience must be substantial to achieve constitutional magnitude"); *Carteret*, 954 F.2d at 150 (concluding that defendant must show that some burden, other than inconvenience, "will be visited upon [it] should [it] be required to litigate"); *TJF Assocs., LLC. v. Kenneth J. Rotman & Allianex, LLC*,

2005 WL 1458753, at *6 (E.D. Pa. June 17, 2005) (noting that "[i]nconvenience to the defendant and potential inconvenience to witnesses are also important factors, but they are not sufficient to defeat personal jurisdiction when minimum contacts have been shown to exist between the defendant and the forum state").

Pointing out that the Supply Agreement provides that New York law would govern any disputes and that the real party in interest is a South Carolina-based company called Nutra Manufacturing, Natrol further contends that subjecting it to personal jurisdiction would be unfair because the parties did not intend to litigate in Pennsylvania. However, as the Court discussed above, Nutra is merely a "doing business as" name for GNC. Further, Plaintiff has established the Natrol's executives knew that they were dealing with GNC and its Pittsburgh-based executives and attorneys in the months leading up to the execution of the Supply Agreement. Pennsylvania has a strong interest in adjudicating disputes involving its citizens, of which GNC is one. *See Burger King Corp.*, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."); *Willyoung v. Colorado Custom Hardware, Inc.*, 2009 WL 3183061, at *14 (W.D. Pa. Sept. 30, 2009) ("The Plaintiff's interest in obtaining convenient and effective relief favors the exercise of jurisdiction over [defendant] because Plaintiff resides in this forum and has obtained counsel here."). Accordingly, because it has not been established that litigating this matter in Pennsylvania would violate notions of fair play and substantial justice, the Court finds that it may exercise specific personal jurisdiction over Defendant Natrol.

An appropriate order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GENERAL NUTRITION CORPORATION d/b/a NUTRA MANUFACTURING, )<br><br>Plaintiff, )<br><br>v. )<br><br>NATROL, INC., )<br><br>Defendant. ) | 02:11-cv-01566 |

## ORDER OF COURT

**AND NOW**, this 30th day of April, 2012, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that the exercise of personal jurisdiction over Defendant Natrol by this Court is appropriate.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:  Gordon W. Schmidt
gschmidt@mcquirewoods.com

Kevin S. Batik
kbatik@mcquirewoods.com

Jon Hogue
jhogue@hoguelannis.com